## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER WILLIAM CAMPBELL and ABBEY LEE CAMPBELL, | No. 4:19-CV-00765 |
| | (Judge Brann) |
| Appellants/Debtors, | |
| v. | |
| MARK J. CONWAY, et al., | |
| Appellees. | |

## MEMORANDUM OPINION

### JANUARY 23, 2020

## I.      BACKGROUND

Appellants/Debtors Christopher William Campbell and Abbey Lee Campbell (collectively "Appellants") appeal the United States Bankruptcy Court for the Middle District of Pennsylvania's ("Bankruptcy Court") order denying Appellants' motion to convert their Chapter 7 bankruptcy case to a Chapter 13 bankruptcy case.[1]

On November 20, 2017, two days prior to a scheduled Sheriff's sale on Appellants' property, Appellants filed a Chapter 13 bankruptcy petition before the Bankruptcy Court.[2]  That petition did not include schedules, statements, or other required documents and, after the Chapter 13 Trustee filed a motion to dismiss, was

---

[1]    *See* Docs. 1, 5.

[2]    A440, 632.

voluntarily dismissed by Appellants.[3]  The Sheriff's sale was thereafter rescheduled for February 28, 2018 but, one day prior to the scheduled sale, Appellants filed the instant Chapter 7 petition.[4]

Appellants are dairy farmers who farm real property that they lease from Terry Campbell—Christopher Campbell's father—and a third party.[5]  Profits from the farm stood at $105,910 in 2017 but declined to $45,411 in 2018.[6]  Christopher Campbell testified that the declining profits resulted from a sustained decrease in milk prices combined with an increase in the cost of farming equipment.[7]

Appellants also previously operated a quarry on Terry Campbell's property, but the quarry was shut down in 2003 when Appellants were fined by the Pennsylvania Department of Environmental Protection ("DEP").[8]  The quarry reopened in 2017 after Appellants agreed to pay DEP $1,000 per month toward the fine, but the quarry again shut down in September 2017—and Christopher Campbell's operating license was suspended for ten years—after Appellants

---

[3]  *See* A632-34.

[4]  A001-07, 444.

[5]  A128, 144.

[6]  A142-43.

[7]  A143-44.

[8]  A144-45.

defaulted on their payments to the DEP.[9]  The quarry generated $74,783 in 2017 prior to shutting down.[10]  Appellants hope to reopen the quarry in the future.[11]

In addition to income from dairy farming and the operation of a quarry, Appellants received a substantial portion of their income from an interest in the MJT Campbell Family LP Trust ("Trust").  In 2017, Appellants received $94,700 in royalties, while that income fell to $53,738 in 2018.[12]  Christopher Campbell testified that income from royalties fluctuates yearly because Trust royalties "go[] up and down with the stock market."[13]  Moreover, royalty payments were made at the sole discretion of the General Partner—Terry Campbell.[14]

Christopher Campbell testified that in 2018 he began collecting and selling field and creek stone from his father's property, although in 2018 that business remained "more or less a start-up operation."[15]  There is also a nearly operational sawmill on Terry Campbell's property, although Appellants in 2018 derived no income from the sawmill.[16]

---

[9]  A145-46.

[10]  A145, 280.

[11]  Although Christopher Campbell's operating license was suspended for ten years, Abbey Campbell obtained an operating license, and Appellants hope that they will be able to obtain an operating permit in the near future.  (A147-48).

[12]  A144.

[13]  *Id.*; *see* A139-40.

[14]  A132, 140, 545.

[15]  A150; *see* A148-50.

[16]  A150.

Appellants' initial Schedule I listed their total income from these activities as $3,211.17 per month.[17]  In an amended Schedule I filed several months later—just prior to a hearing on Appellants' motion to convert their proceeding to Chapter 13—Appellants listed their monthly income as $11,422.25.[18]  Appellants' original bankruptcy schedules show that Branch Banking and Trust Company ("BB&T") has $212,650.12 in secured loans against Appellants' property, while John Deere Finance has a $56,400[19] secured loan against certain of Appellants' property.[20]  Appellants also have $529,732.15 in unsecured loans.[21]  Appellants defaulted on the loans to BB&T in 2016 and have made no payments on those loans since that date.[22]

The Bankruptcy Court held a hearing on Appellants' motion to convert the bankruptcy case to Chapter 13 and, during that hearing, excluded Appellants' proposed Exhibits 2, 3.1, 3.2, 4, and 11.[23]  The Bankruptcy Court determined that the exhibits must be excluded based upon a lack of foundation, as Appellants did not discuss "how those summaries and those exhibits were prepared."[24]

---

[17]  A41-42.

[18]  A100-01.

[19]  The total amount of the loan exceeds $100,000, but only $56,400 of that loan is secured by collateral.  (A28).

[20]  A22-29, 46-51, 93-96.

[21]  A30-38.

[22]  A487.

[23]  A122-30, 151, 499-501.

[24]  A154.

4

Upon conclusion of the hearing, the Bankruptcy Court issued an opinion and order denying Appellants' motion to convert.[25] The Bankruptcy Court determined that several factors militated in favor of denying the motion. First, it concluded that the motion was not filed in good faith because: (1) two bankruptcy petitions were filed only days prior to scheduled Sheriff's sales, indicating bad faith in those filings; (2) Appellants made no payments on their BB&T loans since 2016; and (3) the significant increase in reported income in Appellants' amended Schedule I raised questions about "whether [Appellants] have been forthcoming with the Court and their creditors."[26] Second, the Bankruptcy Court determined that conversion would prejudice Appellants' creditors—who had not received any payments in years—but would not significantly prejudice Appellants, as they likely qualify for Chapter 7 bankruptcy.[27]

Third, the Bankruptcy Court concluded that Appellants likely could not propose a confirmable Chapter 13 plan.[28] Specifically, income from Appellants' dairy farm fell "over 50% year over year" while income from the Trust declined steadily, from $177,208 in 2015 to $53,738 in 2018.[29] The Bankruptcy Court also

---

[25]   A452-63.

[26]   A457; *see* A455-58.

[27]   A458.

[28]   A459-63.

[29]   A461.

noted that "there is uncertainty as to the[] continuity" of Trust payments, since such payments were determined solely by Terry Campbell and, thus, did not constitute regular income within the meaning of the Bankruptcy Code.[30] Moreover, given that the quarry had been closed in 2017 and not reopened, the Bankruptcy Court concluded that any projected income from the quarry was too speculative to rely on, as was any income from the sawmill and stone harvesting operations.[31] Finally, despite having made no payments to BB&T since 2016, Appellants had only $900 in cash reserves; the Bankruptcy Court observed that Appellants' "inability to accrue any cash reserves, while not paying their primary secured creditor, does not bode well for a successful Chapter 13."[32]

Appellants filed a timely notice of appeal[33] raising two issues: (1) whether the Bankruptcy Court erred in excluding certain exhibits during the evidentiary hearing, and (2) whether the Bankruptcy Court clearly erred in denying the motion to convert.[34] BB&T and the Chapter 7 Trustee have filed their briefs in opposition, and Appellants have filed a reply brief, rendering this appeal ripe for disposition.[35] For the following reasons, the Bankruptcy Court's order will be affirmed.

---

[30] A461
[31] A461-62.
[32] A462.
[33] A464-65.
[34] Doc. 5.
[35] Docs. 7, 9, 10.

## II.    DISCUSSION

District courts sit as appellate tribunals when presented with an appeal from a final order of a United States Bankruptcy Court.[36]   On such an appeal, courts will "review basic and inferred facts under the clearly erroneous standard . . . and exercise plenary review over legal issues."[37]   "In reviewing ultimate facts, which are a mixture of fact and legal precept, [this Court] must break down the questions of law and fact and apply the appropriate standard to each component."[38]   Importantly, in reviewing for clear error, it does not matter that this Court "would have reached a different conclusion" if presented with the matter in the first instance.[39]   Rather, the Court must accept the Bankruptcy Court's factual findings unless it is "is left with the definite and firm conviction that a mistake has been committed."[40]

### A.    Whether the Bankruptcy Court Erred in Excluding Exhibits

First, Appellants contend that the Bankruptcy Court erred in excluding Exhibits 2, 3.1, 3.2, 4, and 11 during the hearing on Appellants' motion to convert.[41] Specifically, Appellants contend that exhibits 2, 3.1, and 3.2 were admissible as summaries under Fed. R. Civ. P. 1006, while exhibits 4 and 11 were admissible as

---

[36]   *See* 28 U.S.C. § 158, Fed. R. Bankr. P. 8001(a).

[37]   *In re Fegeley*, 118 F.3d 979, 982 (3d Cir. 1997).

[38]   *Id.* (internal quotation marks omitted).

[39]   *Prusky v. ReliaStar Life Ins.*, 532 F.3d 252, 258 (3d Cir. 2008)

[40]   *Id.* (internal quotation marks omitted).

[41]   Doc. 5 at 17-19.

ordinary documents not subject to any exclusionary rule.[42]  This Court reviews the

Bankruptcy Court's "evidentiary rulings for abuse of discretion, but . . . exercise[s]

plenary review to the extent the rulings are based on a legal interpretation of the

Federal Rules of Evidence."[43]

Federal Rule of Evidence 1006 provides that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.  And the court may order the proponent to produce them in court.

"It is well established that summary evidence is admissible under Rule 1006

only if the underlying materials upon which the summary is based are admissible."[44]

As summarized by the United States Court of Appeals for the District of Columbia

Circuit, for documents to be admissible under Rule 1006, five requirements must be

met: (1) "the documents must be so voluminous as to make comprehension by the

[factfinder] difficult and inconvenient;" (2) "the documents themselves must be

admissible;" (3) "the documents must be made reasonably available for inspection

---

[42]  *Id.*

[43]  *United States v. Fattah*, 914 F.3d 112, 177 (3d Cir. 2019) (alterations and internal quotation marks omitted).

[44]  *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992).

and copying;" (4) "the summary must be accurate and nonprejudicial;" and (5) "the witness who prepared the summary should introduce it."[45]

Exhibit 2 is a summary of Appellants' estimated monthly dairy income in 2017,[46] Exhibit 3.1 is an extrapolation of monthly income produced using Appellants' 2017 tax returns,[47] and Exhibit 3.2 is a list of income from collecting field stone in 2018.[48] Exhibit 4 is a list of cows registered to Appellants and others,[49] while Exhibit 11 consists of confessions of judgment and accompanying loan notes from BB&T.[50] The parties agree that Exhibits 4 and 11 are not summaries, and their admissibility therefore is not governed by Rule 1006.[51]

Turning to Exhibit 2, the Court concludes that the Bankruptcy Court correctly refused admission of this exhibit for several reasons. First, there was no testimony offered as to how the document was prepared or upon what voluminous document Exhibit 2 was based.[52] Clearly then, there was no way for the Bankruptcy Court— or this Court—to determine whether the underlying documents were voluminous or admissible, or whether the summary was accurate. Moreover, there is no indication

---

[45] *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014).

[46] A124-25.

[47] A122-23.

[48] A126.

[49] A127-28.

[50] A129-30.

[51] *See* Doc. 5 at 19; Doc. 7 at 11-13.

[52] *See* A124-26, 155-69.

that the underlying documents were made available to the Trustee or BB&T for inspection. Finally, it appears that Exhibit 2 was prepared by Appellants' attorney[53] and, thus, the exhibit was not introduced by the individual who prepared it.

Exhibit 3.1 was prepared by counsel using Appellants' 2017 tax returns.[54] Those returns are not so voluminous as to make their comprehension "difficult and inconvenient";[55] as the Bankruptcy Court noted during the hearing, it could reference the 2017 returns if needed.[56]   Additionally, as with Exhibit 2, Exhibit 3.1 was prepared by Appellants' attorney, and thus was introduced by the wrong individual.[57]

As to Exhibit 3.2, there again was no testimony offered as to how the exhibit was prepared or upon what voluminous document Exhibit 3.2 was based.[58] Although Appellants provided invoices that may have been used to create Exhibit 3.2,[59] those documents are not voluminous enough to make their comprehension "difficult and inconvenient."[60]   More importantly, as BB&T accurately notes, Exhibit 3.2 is not a summary but, rather, a synthesis of information.  The chart

---

[53]   *See* A125 (asking whether Christopher Campbell had "reviewed" the document); A499 (Bankruptcy Court noting that counsel was "involved in the . . . creation" of the exhibits).

[54]   A499.

[55]   *Fahnbulleh*, 752 F.3d at 479.

[56]   A473.

[57]   *See* A122, 499 (counsel discussing how he created Exhibit 3.1).

[58]   A126-27.

[59]   A173-90.

[60]   *Fahnbulleh*, 752 F.3d at 479.

included in Exhibit 3.2 takes data from approximately four months of sales and extrapolates that over the course of one year, which necessitated, *inter alia*, assumptions about the length of time that frozen ground would prevent stone extraction.[61] The United States Court of Appeals for the Third Circuit has held that "calculations [going] beyond the data they summarized and includ[ing] several assumptions, inferences, and projections about future events" are properly classified as expert opinions that are "subject to the rules governing opinion testimony" rather than Rule 1006.[62] No testimony was proffered that would render Exhibit 3.2 admissible under Fed. R. Evid. 702, and it was therefore properly excluded by the Bankruptcy Court.

Turning then to Exhibits 4 and 11, Exhibit 4 was properly excluded because Appellants laid no foundation for the admission of that exhibit. Christopher Campbell merely testified that the information contained in the exhibit was true and correct.[63] However, he offered no testimony about how the document was prepared, what information it was based on, or the origins of the information contained therein. Similarly, Exhibit 11 was properly excluded because, while Christopher Campbell testified that he "recognized" the documents, he did not testify that the documents

---

[61] A173.

[62] *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007).

[63] A127-28.

were accurate and did not otherwise authenticate them.[64]  In sum, the Bankruptcy Court did not clearly err in excluding Exhibits 2, 3.1, 3.2, 4, or 11.

## B. Whether the Bankruptcy Court Erred in Denying Appellants' Motion to Convert

Appellants next argue that the Bankruptcy Court clearly erred in denying their motion to convert their proceeding to Chapter 13.[65]  First, Appellants contend that the Bankruptcy Court clearly erred in finding bad faith, as the timing of their bankruptcy filings is not alone suspicious, and any suspicious activities occurred solely as a result of prior counsel's poor advice.[66]  Second, Appellants assert that there was a good faith basis for the large increase in income in the amended Schedule I.[67]  Third, Appellants argue that denial of the motion would substantially prejudice them, as they would not qualify for Chapter 7 proceedings.[68]  Finally, Appellants contend that, given their estimated income, there is a reasonable likelihood that they will be able to fund a Chapter 13 plan.[69]

In deciding whether to grant a contested motion to convert, courts should consider five factors:

---

[64]  A129-30.

[65]  Doc. 5 at 19-27.

[66]  *Id.* at 21-23.

[67]  *Id.* at 24-25.

[68]  *Id.* at 26.

[69]  *Id.* at 27.

> (i) whether the debtor is seeking to convert to chapter 13 in good faith (including a review of facts such as the timing of the motion to convert; the debtor's motive in filing the motion; and whether the debtor has been forthcoming with the bankruptcy court and creditors);
> (ii) whether the debtor can propose a confirmable chapter 13 plan;
> (iii) the impact on the debtor of denying conversion weighed against the prejudice to creditors caused by allowing conversion;
> (iv) the effect of conversion on the efficient administration of the bankruptcy estate; and
> (v) whether conversion would further an abuse of the bankruptcy process.[70]

After reviewing the record and weighing the relevant factors, the Court concludes that the Bankruptcy Court did not abuse its discretion in denying Appellants' motion to convert.

> i.    Good Faith Analysis

As to the first factor, the Court cannot conclude that the Bankruptcy Court clearly erred when it determined that Appellants filed the motion in bad faith.  In deciding whether a motion is pursued in good faith, the Third Circuit has outlined several considerations for which courts should account:

> the nature of the debt; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.[71]

---

[70]    *In re Pakuris*, 262 B.R. 330, 335-36 (Bankr. E.D. Pa. 2001).
[71]    *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996).

"Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith."[72]

First, as the Bankruptcy Court noted, the timing of Appellants' petitions and the intent that one may infer from those petitions are indicative of bad faith. Appellants first filed a Chapter 13 petition two days prior to a scheduled Sheriff's sale on their property.[73]  Appellants did not file any of the documentation necessary to support their petition, prompting the Chapter 13 Trustee to file a motion to dismiss the petition and then Appellants to voluntarily dismiss the action.[74]  Shortly thereafter the Sheriff's sale was rescheduled but, one day prior to the sale, Appellants filed this Chapter 7 petition.[75]  By filing the first petition just prior to the Sheriff's sale, voluntarily dismissing that petition, and then filing an additional petition just prior to the second Sheriff's sale, it appears that Appellants did not seriously intend to pursue bankruptcy but, instead, merely sought to stave off a sale of their property.

Second, the Bankruptcy Court did not clearly err in concluding that Appellants' behavior indicated that they had not been forthcoming with their creditors or the Bankruptcy Court.  The Bankruptcy Court observed that Appellants filed an amended Schedule I just three days prior to a hearing on Appellants' motion

---

[72]  *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).

[73]  A440, 632.

[74]  A632-34.

[75]  A001-07, 441.

to convert.[76] The amended Schedule I included a tremendous increase in monthly income, from $3,211.17[77] to $11,422.25.[78]  This significant and unexplained increase in income understandably caused the Bankruptcy Court to "question whether [Appellants] have been forthcoming with the Court and their creditors."[79]

The suggestion of a lack of candidness is emphasized by the speculative and unsupported nature of many of the calculations made in the amended Schedule I. Appellants' income from dairy farming and the Trust dropped precipitously from 2015 to 2018,[80] and there is no testimony, documentation, or other indication in the record that those incomes increased between the time that the original Schedule I and amended Schedule I were filed.  Similarly, estimates of future earnings based upon a sawmill that may be operational at some point in the future,[81] a stone-collecting business that Christopher Campbell agreed was "more or less a start-up operation"[82] and may not be operational for months every year due to frozen ground,[83] and a quarry that has twice been shut down by the DEP and been inactive

---

[76]  A93-120, 457, 510, 619-21.  As BB&T notes, Appellants took actions and made statements which indicate that they sought to shield their partnership interest from bankruptcy proceedings.  (Doc. 7 at 16-17; A14, 20, 42, 151).

[77]  A41-42.

[78]  A100-01.

[79]  A457.

[80]  A139-40, 142-44, 461.

[81]  A150.

[82]  A150; *see* A148-50.

[83]  A173.

for more than one year—due to Christopher Campbell's failure to pay a fine to the DEP[84]—are far too speculative to support the increased income in the amended Schedule I.

As the United States District Court for the Eastern District of Pennsylvania has noted, where an individual is self-employed, the viability of income projections "will be based upon his/her earnings history (preferably demonstrated by federal tax returns), his/her current income and the likely stability of that income in the future."[85] Appellants demonstrated no previous earnings from the sawmill and, indeed, the sawmill is not operational, which undermines the veracity of any projected income from that source. Similarly, Appellants' stone collection business had only produced four months of income when the Bankruptcy Court held its hearing, which is insufficient to reach a well-founded determination about future income. This is amplified by the fact that the business must shut down for part of the year due to freezing weather—an occurrence that cannot be predicted with any accuracy, particularly since Appellants never previously operated the business during the winter. Finally, given that the quarry was twice shut down, Christopher Campbell's operating license has been suspended for ten years, and Appellants have

---

[84]   A144-46.

[85]   *In re Soppick*, 516 B.R. 733, 749 (Bankr. E.D. Pa. 2014).

not yet obtained a license to reopen the quarry, any projected income from that source is "speculative, conjectural or unrealistic."[86]

Finally, Appellants' treatment of BB&T and the negative impact that their actions have had on BB&T militate in favor of a finding of bad faith. As the Bankruptcy Court noted, Appellants have not made a payment to BB&T—their largest secured creditor—since 2016, despite attempting to work out payment plans with the DEP and John Deere.[87] The refusal to make any payments to BB&T for years negatively impacted that creditor, and Appellants' "deliberate and persistent pattern of evading a single major creditor" is suggestive of bad faith.[88]

Although Appellants argue that they should not be held responsible for their legal counsel's poor decisions,[89] their position is without merit. "It is, of course, beyond cavil that the attorney-client relationship is an agent-principal relationship."[90] This establishes a close relationship between Appellants and their former attorney and serves as ratification of any actions taken by the attorney. Thus, in a different context, the United States Supreme Court has rejected claims that an attorney's actions should excuse procedural errors:

---

[86] *Id.* at 750.

[87] A456, 462.

[88] *In re Mottilla*, 306 B.R. 782, 790 (Bankr. M.D. Pa. 2004).

[89] Doc. 5 at 22-23.

[90] *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853 (3d Cir. 1996).

There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.[91]

The Supreme Court went on to note that "if an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice. But keeping [a] suit alive merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of plaintiff's lawyer upon the defendant."[92] Similarly, the United States Court of Appeals for the First Circuit has noted that "it is well settled that reliance upon advice of counsel is . . . no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules."[93] The First Circuit went on to explain what should be obvious to all debtors: "[a] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."[94]

---

[91] *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962) (internal quotation marks omitted).

[92] *Id.* at 634 n.10.

[93] *In re Tully*, 818 F.2d 106, 111 (1st Cir. 1987).

[94] *Id.*

Appellants should have known that their statements in their original Schedules regarding their income and ownership interest in the Trust were incorrect and, to the extent that prior counsel offered advice contrary to what Appellants knew to be true, they had a duty to place the correct information in their schedules.[95]  Perhaps more importantly, Christopher Campbell's testimony reveals that, in at least some respects, Appellants knew the advice of their prior attorney to be incorrect but did not challenge his decisions or correct his statements.   When questioned about Appellants' decision to file a Chapter 13 petition prior to the first scheduled Sheriff's sale and then voluntarily dismiss that petition, Christopher Campbell testified "my attorney came to my house, and told me there's no way you can make the payment . . . He gave me a payment of . . . 65 hundred a month.  I could've done it . . . [but] I was listening to my attorney."[96]  To the extent that Appellants *knew* that counsel's advice was erroneous but nevertheless consented to that advice and action, they cannot hide behind counsel's advice to absolve themselves of responsibility for their actions.[97]   In this instance, former counsel's actions are attributable to Appellants and, therefore, those actions may be used in evaluating Appellants' good or bad faith.

---

[95]   A130-36.

[96]   A152; *see* A151-52.

[97]   *Cf. United States v. Traitz*, 871 F.2d 368, 382 (3d Cir. 1989) ("The [advice of counsel] defense is not designed to insulate illegal conduct.  Rather, the basis for the defense is that, in relying on counsel's advise, a defendant lacked the requisite intent to violate the law" (citation, brackets, and internal quotation marks omitted)); *In re Roach*, No. ADV 13-2064-CMB, 2014 WL 1884345, at *6 (Bankr. W.D. Pa. May 12, 2014) ("Given that Debtor had, at this point, become aware of Attorney Veterano's significant misunderstanding of bankruptcy law in

In sum, there is ample evidence to support the Bankruptcy Court's finding of bad faith. It does not matter that this Court may "have reached a different conclusion" if reviewing this matter in the first instance.[98] Rather, the Bankruptcy Court's "factual findings are 'plausible' when viewed in light of the entirety of the record," they must therefore be affirmed.[99]

### ii.    Confirmable Chapter 13 Plan

Second, the Bankruptcy Court did not err in concluding that Appellants have not demonstrated a likely ability to adequately fund a Chapter 13 plan.[100] As previously discussed, Appellants' purported income is unsupported by any evidence. Income from dairy farming and payments from the Trust dropped from 2015 to 2018, and any income from Appellants' quarry, sawmill, or stone collecting operations are too speculative to support a Chapter 13 plan.[101]

Moreover, the evidence demonstrates that, despite making no payments to BB&T, Appellants had, at most, $900 in their bank account, which indicates that they barely managed to make their monthly payments—even without making any

---

advising Debtor to continue operating GRL post-petition, the Court finds that it would be unreasonable for the Debtor to forgo Trustee Zebley's instruction based on Attorney Verterano's representation").

[98]    *Prusky*, 532 F.3d at 258.

[99]    *Id.*

[100]    A459-63.

[101]    *See* pp. 15-17.

payments to their largest creditor.[102]  This conclusion is supported by the fact that Appellants previously defaulted on their $1,000 per month payments to the DEP that were necessary to continue operating their quarry.[103]  Given that the quarry was a large source of income for Appellants, it stands to reason that they would have made payments to DEP if it all possible.  In light of the evidence that Appellants are unable to make payments to at least two creditors, it is doubtful that they would be able to sustain a Chapter 13 plan.

Additionally—although not raised by the Bankruptcy Court or Appellees—the Court is concerned that Appellants may not qualify for Chapter 13 proceedings. The relevant provision of Chapter 13 provides that an individual "may be a debtor under chapter 13 of this title" if the individual and his or her spouse "owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than [$419,275]."[104]  Appellants' originally bankruptcy schedules show that they owe $529,732.15 in unsecured loans,[105] which raises the substantial possibility that they do not qualify for Chapter 13 proceedings.

---

[102]  A494.

[103]  A144-46.

[104]  11 U.S.C. § 109(e).

[105]  A30-38.

iii.     Prejudice to Creditors Versus Appellants

Finally, the Bankruptcy Court correctly noted that an analysis of prejudice to the creditors versus prejudice to Appellants weighs in favor of denying the motion to convert.  First, BB&T would suffer at least some prejudice from the conversion because, not only has BB&T not received a payment from Appellants for years but, as discussed above, there is little likelihood that Appellants can successfully fund a Chapter 13 plan.  This means that BB&T would likely not see any payments from Appellants for the foreseeable future.

Balanced against that prejudice is the likelihood of little prejudice to Appellants.  The Bankruptcy Court concluded "that the denial of conversion to Chapter 13 will have relatively little impact on [Appellants][, as] [t]hey appear to be eligible for a Chapter 7 bankruptcy discharge with its attendant fresh start."[106] Appellants have not demonstrated that this conclusion is erroneous.  Appellants argue only that they do not qualify for Chapter 7 proceedings because their monthly income is above the median level, and any Chapter 7 petition is thus presumptively abusive.[107]   However, as discussed previously, much of Appellants' income is speculative and unsupported.  Moreover, as BB&T notes, the presumptively abusive test applies only to "an individual debtor under this chapter whose debts are

---

[106]  A458.

[107]  Doc. 5 at 26.

primarily consumer debts."[108]  Appellants' debt is almost exclusively non-consumer debt[109] and, thus, the Chapter 7 petition is not presumptively abusive.  There is no indication that Appellants do not qualify for Chapter 7 proceedings, and the Bankruptcy Court did not clearly err in concluding otherwise.

A balance of the relevant factors related to the motion to convert militates in favor of denying Appellants' motion.  Accordingly, the Court finds that the Bankruptcy Court did not err in denying that motion.

## III.    CONCLUSION

For the foregoing reasons, the Bankruptcy Court's April 23, 2019 Order will be affirmed.  An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[108]  11 U.S.C. § 707(b)(1); *see* Doc. 7 at 23.

[109]  A022-38, 093-98.